PEARCE (EICKEMEYER HAT–BLOCK-ING MACHINE CO. v.). See Case No. 4,312.

PEARCE (MULFORD v.). See Cases Nos. 9,-907 and 9,908.

PEARCE (NICHOLS v.). See Case No. 10,-246.

PEARCE (SMITH v.). See Case No. 13,089.

PEARCE (UNITED STATES v.). See Cases Nos. 16,020 and 16,021.

## Case No. 10,874.

### The PEARL.

[Betts' Pr. Cas.]

District Court, S. D. Florida. May 6, 1863.

PRIZE—VIOLATION OF BLOCKADE—INTENT—EVIDENCE.

[1. A vessel bound on a voyage from Liverpool to Nassau, with an intention of merely touching at the latter port, and then proceeding to a blockaded port of a state in rebellion against the United States, is engaged in an attempt to violate the blockade, and is subject to capture before reaching Nassau as well as after leaving that port. Following The Dolphin, Case No. 3,975.]

[2. If an owner sends his vessel to a neutral port, with a settled intention to commence therefrom a series of voyages to a blockaded port, he thereby commences to violate the blockade and subjects his vessel to capture before she reaches the neutral port, notwithstanding that he may also intend to unload her there, discharge the crew, and give all other external manifestations of an intention to end the voyage at that place.]

[Cited in The Stephen Hart, Case No. 13,364.]

[3. Where a vessel was captured on a voyage from Liverpool to Nassau, and there was strong evidence, both in the circumstances and in the testimony of the crew, that she was to be used, after reaching that port, for voyages to blockaded ports of the states in rebellion against the United States, *held*, that it was not unreasonable to require the claimant, if innocent, to clear up the circumstances of the transaction by his own oath and the oaths of others connected with the contemplated business of the vessel.]

[4. In respect to merchandise found on board the vessel, and consigned, as stated in the bill of lading, to certain merchants in Nassau, who made claim to the goods, it would not be unreasonable to require them to furnish their own affidavits that they had ordered the goods, that they were shipped on their account for their risk and benefit, that they belonged solely to them at the time of shipment and of capture, and would still be theirs if restored, and that no enemy of the United States has any interest, directly or indirectly, therein. Nor would it be unreasonable to require them to furnish a sworn copy of their order to their English correspondents for the goods.]

[This was a libel against the steamer Pearl and her cargo to procure their condemnation as prize for attempting to violate the blockade.]

MARVIN, District Judge. This steamer, of the net burthen of 72.17 tons, William Jolly, master, having on board 10 bales of merchandise, supposed to be ready-made clothing, was captured by the United States ship Tioga, on the 20th day of January last, while ostensibly bound on a voyage from Liverpool to Nassau. The capture is said to have been made about 60 or 70 miles from Nassau.

A claim to the vessel has been interposed by the master on behalf of George Wigg, who is alleged to be a merchant residing in Liverpool, and to the merchandise on behalf of Henry Adderly & Co., merchants, of Nassau. It is understood that the delay in bringing the case to a hearing has been at the request of the claimants' proctor, in order to give him time to consult his clients and prepare further testimony.

I have already decided, in the case of The Dolphin [Case No. 3,975], that a vessel bound on a voyage from Liverpool to Nassau, with an intention of touching only at the latter port, and of proceeding thence to a blockaded port of the enemy, is engaged in an attempt to violate the blockade, which subjects her to capture, in the antecedent as well as in the ultimate stage of the voyage,—before arriving at Nassau, as well as after having left that port. I think the law also is that if an owner sends his vessel to a neutral port, with a settled intention to commence from such a port a series of voyages to a blockaded port, he thereby commences to violate the blockade, and subjects his vessel to capture, notwithstanding he may also intend to unlade the vessel at the neutral port, discharge the crew, and give all other external manifestations of an intention to end the voyage at such port. Where a deliberate purpose exists to violate a blockade, and measures are actually taken to accomplish that object, the law couples the act and the intent together, and declares the offense to be complete. The resorting, therefore, to a neutral port for the purpose of the better disguising the intention, or of procuring a pilot for the blockaded port, or of perfecting the arrangements, so as to increase the chances of a successful violation of the blockade, will not, in the least, extenuate the offense or avoid the penalty. These measures may increase the difficulty of discovering the true intention, but whenever it is discovered it will give to the transaction its true legal character. The leading authorities are The Columbia, 1 C. Rob. Adm. 154; The Neptunus, 2 C. Rob. Adm. 110; Yeaton v. Fry, 5 Cranch [9 U. S.] 335; The Richmond, 5 C. Rob. Adm. 325; The Maria, Id. 365; The William, Id. 385.

Now, it is a notorious fact that a considerable number of steamers, near the size of this, being swift sailers and drawing but little water, have lately come out from England to Nassau, and have entered at once upon the business of running the blockade at Charleston or Wilmington, and have continued regularly in that business until they have been captured. We do not hear of any of them engaging in any other business or trade. Indeed, it is very well known that there is no other business or employment at Nassau for steamers of the size of this, in which they can engage with a reasonable prospect of

clearing even the expenses of running. And to these considerations the facts that Charles Nelson, John G. Richardson, Thomas McWinnie, William McClellan, Joseph Carmaghan, William Latimer, and James Duffie, part of the crew of the vessel, concur in general terms in saying that, although they were hired only for a voyage to Nassau, yet they believed that the business of this vessel, after getting out to Nassau, was to be in running between that port and Charleston or Wilmington, and that some of them give as reasons for their belief the conversations had on the subject, and the circumstances attending the late purchase, in Glasgow, of the vessel by the present claimant. Some of them say, too, that there was a Confederate flag on board,— put on board in Glasgow, as a part of her fitting out. They generally concur in saying that it was the common opinion of the crew on board that the vessel was to be employed in running to Charleston or Wilmington, and that she was going out to Nassau for that purpose, and that, although they were not bound by their shipping agreement to go any further than to Nassau, yet it was understood, that they would have an opportunity there to reship in this vessel, or other vessels employed in that trade. Neither the master, the mate, nor any other witness examined, pretends to give any reason for the vessel's going to Nassau, nor any opinion as to what her voyage or employment was intended to be. The claimant, Mr. Wigg, simply says, in reference to the subject, in his letter to the consignee in Nassau: "You will have received instructions by regular mail in regard to this vessel." Now, it seems to me that the testimony, as it stands, taking all the facts together, raises a very strong presumption, that the owner was sending out this vessel to Nassau with the settled purpose that she should be employed in running between that port and the ports of Charleston and Wilmington in violation of the blockade. There is not a fact or a tittle of testimony in the case to rebut that presumption. But, the vessel being captured when really going from one neutral port to another, I am unwilling to pass a decree of condemnation without giving to the claimant the time and all the facilities he may desire to produce evidence to rebut the powerful presumption against him. He has it in his power, if innocent, to clear up the whole matter by his own oath, and by the oaths of others connected with the contemplated business of this vessel. If she was going out to Nassau for an innocent and lawful purpose, he can show it. He can state on oath and show what trade or business he intended she should be engaged in.

As to the 10 bales of merchandise, the claimants, Messrs. Henry Adderly & Co., may very reasonably be called upon to furnish their own affidavits at least that they had ordered these goods, that they were shipped on their account, and for their risk and benefit, and that the goods belonged solely to them at the time of shipment and at the time of capture, and are theirs still, and will be solely theirs if restored, and that no enemy of the United States has any interest, legal or equitable, directly or indirectly, in them. It would not be unreasonable to expect that they will also furnish a sworn copy of the order supposed to have been given to their English correspondent to send them these goods. See the case of The Concordia Affinitatis, 1 Hay & M. 289. The bill of lading states that the goods were shipped by George Wigg, the claimant of the ship, to be delivered to Henry Adderly & Co. No letter of advice relative to them, nor any invoice, is found among the papers. The claim filed by the master asserts that Adderly & Co. are the owners. If the master should be mistaken, the true owner of the goods, whoever he may be, is at liberty to file his claim, supported by a full affidavit of title. In whatever manner I may in the end decide this cause, it is pleasant to know that the parties, captors or claimants, if dissatisfied, may have a rehearing, a trial de novo, in the supreme court, where ample justice can be done them.

It is ordered that the claimant of the ship in this case be allowed to produce further evidence, by his own oath and otherwise, touching his interest therein, and the use he intended at the time of capture to make of the vessel after her arrival at Nassau, the trade or business he intended she should be engaged in, and for what purpose she was going to that port; and that the claimant of the goods have time to procure an affidavit of his right and title thereto, and to produce such other proof of neutral ownership as he may be advised.

[No proof was produced as directed, and on further hearing a decree was entered restoring the vessel and cargo to the claimants. From this decree the United States appealed to the supreme court, where there was a decree of condemnation against the merchandise as well as the ship. 5 Wall. (72 U. S.) 574.]